DECISION
{¶ 1} Relator, Mary J. Tracy, commenced this original action requesting a writ of mandamus that orders respondent Industrial Commission of Ohio to vacate its order concluding that relator sustained an intervening injury, denying her request for allowance of an additional condition, denying her application for temporary total disability *Page 2 
compensation, and denying payment of surgical bills, and instead to find that the additional problems relator is having are directly related to the original work-related injury.
 {¶ 2} Pursuant to Civ.R. 53 and Section (M), Loc.R. 12 of the Tenth Appellate District, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) In her decision the magistrate concluded (1) the commission abused its discretion by finding relator sustained an intervening injury in the absence of any medical evidence to support that finding; and (2) the commission did not violate relator's due process rights in not specifically notifiying her that the issue of an intervening injury would be addressed at the hearing. Having concluded, however, that relator's first argument had merit, the magistrate determined this court should issue a writ of mandamus.
 {¶ 3} Respondents, Industrial Commission of Ohio and AutoZone, Inc., filed objections to the magistrate's conclusions of law. AutoZone's objections initially challenge the magistrate's determination that the commission abused its discretion in finding relator's worsened condition was the result of an intervening injury. As the magistrate noted, the only medical evidence before the commission was that of Dr. Mumma, relator's treating physician. Contending his reports support the commission's order, AutoZone, Inc. focuses on isolated language from Dr. Mumma's reports, such as his reference to a "new finding" in an MRI performed on relator on February 16, 2006, as compared to an earlier MRI.
 {¶ 4} The whole of Dr. Mumma's materials following the second MRI, however, leave no doubt that Dr. Mumma found relator's "original injury of 01/30/2004 was the proximate and sole cause of the neck pain, arm pain, and MRI findings of herniated *Page 3 
nucleus pulposus of C5-6 and C6-7. It is also my opinion that her surgery was medically necessary and performed only as a consequence of her injury." (Dr. Mumma June 10, 2006 letter.) The commission had no medical reports to the contrary. Because the commission itself lacked the medical expertise to adjudicate medical issues without the necessary medical evidence, the magistrate properly concluded the commission abused its discretion in determining relator sustained an intervening injury. State ex rel. Steinbrunner v. Indus. Comm., Franklin App. No. 05AP-626, 2006-Ohio-3444; State ex rel. Yellow Freight Sys., Inc. v.Indus. Comm. (1998), 81 Ohio St.3d 56.
 {¶ 5} Both respondents contend the matter is not ripe for adjudication pursuant to the Supreme Court of Ohio's opinion in State ex rel. ElyriaFoundry Co. v. Indus. Comm. (1998), 82 Ohio St.3d 88 because an appeal is pending in Muskingum Country to address the commission's determination that the requested additional condition be disallowed. Contrary to respondents' contentions, Elyria Foundry does not dispose of relator's mandamus action.
 {¶ 6} In Elyria Foundry, "[t]he allowance of claimant's entire workers' compensation claim [was] in dispute, as [were] the medical conditions allegedly related to it." Id. at 89. By contrast, relator's claim here already was allowed for "left shoulder strain; C6-7 herinated nucleus pulposus; C5-6 disc protrusion." (Magistrate's Finding of Fact No. 1.) To the extent the allowed claims support relator's request for temporary total disability compensation and payment of surgical bills, the issue is ripe for determination. To the extent, however, pending litigation in the common pleas court pursuant to R.C. 4123.512 renders allowance of an additional condition to be uncertain, temporary total disability compensation relating to that additional condition is not ripe for consideration under Elyria *Page 4 Foundry. Because, however, the temporary total disability and surgical bills arising from the currently allowed conditions are properly determined, respondents' contentions are unpersuasive, in part.
 {¶ 7} Accordingly, respondents' objections are overruled in part and sustained in part.
 {¶ 8} Following independent review pursuant to Civ.R. 53, we find the magistrate has properly determined the pertinent facts and applied the salient law to them. Accordingly, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained in it, with a modification in the terms of the granted writ. We issue a writ of mandamus ordering the commission to vacate its order denying relator's request for temporary total disability compensation and for payment of surgery, and to issue an order granting payment of surgery and temporary total disability compensation arising from the surgery. Given the pending appeal on the request for an additionally allowed condition, the issue of temporary total disability compensation relating to that condition is not ripe under Elyria Foundry.
 Objections overruled in part and sustained in part; writ granted.
 PETREE and McGRATH, JJ., concur. *Page 5 
 APPENDIX A MAGISTRATE'S DECISION Rendered on July 30, 2007 IN MANDAMUS {¶ 9} Relator, Mary J. Tracy, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order wherein the commission concluded that relator had sustained an intervening injury, denying her request for the allowance of an additional *Page 6 
condition, denying her temporary total disability ("TTD") compensation, and denying the payment of surgical bills and ordering the commission to find that the additional problems relator is having are directly related to the original work-related injury.
Findings of Fact: {¶ 10} 1. Relator sustained a work-related injury on January 30, 2004, and her claim was ultimately allowed for the following conditions: "left shoulder strain; C6-7 herniated nucleus pulposus; C5-6 disc protrusion."
 {¶ 11} 2. Relator received periods of TTD compensation through December 29, 2005. At that time, the commission determined that relator's allowed conditions had reached maximum medical improvement ("MMI").
 {¶ 12} 3. On January 18, 2006, relator's treating physician, Paul D. Mumma, D.O., opined that she was capable of driving a motor vehicle without restriction. He noted further that relator appeared to have no rotational restrictions on her neck, but that her cervical range of motion was somewhat decreased with regards to flexion, extension, and side bending. Dr. Mumma concluded:
 ASSESSMENT: 1) Cervical disk disease secondary to acute herniated nucleus pulposus, job related. 2) We will be arranging vocational rehab and I have given the patient some restrictions on her employment. She is not to be doing any heaving lifting. I would prefer she have a driving job where she does not have to load or unload heavy objects and she should be climbing, reaching down and using upper extremities occasionally, but not repetitively.
 {¶ 13} 4. Less than one month later, relator was seen again by Dr. Mumma. Relator was experiencing severe headaches. In his office note dated February 6, 2006, Dr. Mumma noted: *Page 7 
 * * * The patient comes in after reinjuring her neck last Thursday while pushing back with her neck against the headrest of her car. This was sudden. She felt a articulation in her cervical spine and has had severe occipital and cervical pain syndrome ever since. * * *
 * * *
 ASSESSMENT AND PLAN: 1) Lower cervical spine injury associated with an acutely herniated nucleus pulposus in the past. I believe she has reinjured her neck.
 * * *
 {¶ 14} 5. An MRI performed on February 15, 2006 revealed:
 * * * This MRI study of the cervical spine is compared to a previous such study performed on 06/28/04 revealing a broad-based disc herniation at the C6-7 level mildly flattening the cord with a protrusion of disc posteriorly to a lesser extent at the C5-6 level without mass effect at that location.
 The present study reveals the persistence of these findings with some progression disease at C6-7 level as the posteriorly protruding disc herniation does slightly impinge the descending cervical spinal cord now at the C6-7 level although no signal abnormalities of the cervical spinal cord are evident. * * *
 CONCLUSION:
 There is a persistence of cervical disc herniation at the C6-7 level and with mild C5-6 disc protrusion as well. There has been some advancement in this disease process as the posterior protruding extradural defect at the C6-7 level does abut and slightly impinge the descending cervical spinal cord in this location, which is a new finding. This is a finding of clinical concern although no signal abnormalities of the cervical spinal cord are evident at this location. See above discussion. Although the disc protrusion posteriorly is broad-based, it is primarily present in the right central and paracentral location.
By comparison, the June 28, 2004 MRI revealed:
 There is broad-based disc herniation at C6-7 which is mildly flattening the cord. There is a lesser degree of disc protrusion *Page 8 
at C5-6 without significant mass effect or lateralizing component. The cord signal is maintained.
 IMPRESSIONS:
 * * * Broad-based disc herniation C6-7 with minimal mass effect on the cord.
 * * * Some mild degree of disc protrusion without significant mass effect C5-6.
 {¶ 15} 6. Relator saw Dr. Mumma again on February 20, 2006. At that time, he noted in his office notes:
 * * * Her MRI shows persistence of a disk herniation at C6-C7 and C5-C6. There has been some advancement at least in the process with some extradural defects at the C6-C7 level. She has no arm symptoms. I am concerned that this may not be a stable situation. We will be asking for a neurosurgical consult. * * *
 ASSESSMENT AND PLAN: 1) Cervical disk disease. 2) Secondary chronic tension headaches due to cervical disk disease. I will be asking these diagnoses to be added to her claim. * * *
 {¶ 16} 7. Relator was seen by Mark A. Fulton, M.D., on April 3, 2006. Dr. Fulton recommended a C6-7 interior cervical diskectomy with allograft fusion and plate fixation. This surgery was performed by Dr. Fulton on April 25, 2006.
 {¶ 17} 8. On June 9, 2006, Dr. Mumma completed a C-84 certifying that relator was temporarily totally disabled from April 4, 2006 through an estimated return-to-work date of August 21, 2006. At that same time, relator requested that her claim be additionally allowed for "chronic tension headache, 307.81." Dr. Mumma also completed C-9s requesting that relator's diskectomy be approved and paid for. *Page 9 
 {¶ 18} 9. Dr. Mumma authored a letter dated June 10, 2006 addressed to relator's attorney. Dr. Mumma stated, in relevant part:
 On 01/30/2004, Ms. Tracey [sic] injured her neck while pulling on a skid at work. She suffered the immediate onset of neck pain radiating into her left arm and crescendoing over the subsequent several days. Since that time MRI scanning has clearly demonstrated a herniated cervical nucleus pulposus.
 She was found most recently to have a C6-7 herniated nucleus pulposus and a C5-6 disk protrusion.
 Ms. Tracey [sic] did exacerbate her preexisting injury while repositioning herself in her car on 02/06/2006.
 At that time she felt an increase in pain in her arm and her neck hurt more than usual for a while.
 Ms. Tracy had a preexisting work-related herniated nucleus pulposus at C5-6 and C6-7 documented by MRI scanning prior to her mild exacerbation of this same injury on 02/06/2006. It was preexisting and mere active pushing on the headrest would not have caused a herniated nucleus pulposus to appear somewhere else. This pathology was clearly demonstrated and addressed surgically by Dr. Fulton on 05/26/2006.
 There is also compelling evidence that Ms. Tracy is feeling much better. Her arm pain has all but disappeared and her neck pain is much improved following surgery. Therefore, I am of the opinion that Ms. Tracy's original injury of 01/30/2004 was the proximate and sole cause of the neck pain, arm pain, and MRI findings of herniated nucleus pulposus of C5-6 and C6-7. It is also my opinion that her surgery was medically necessary and performed only as a consequence of her injury.
 {¶ 19} 10. Dr. Mumma authored another report, dated September 6, 2006, wherein he explained why surgery was necessary:
 The main reason for sending Ms. Tracy to a surgeon at that particular time was development of increasing neurologic *Page 10 
symptoms involving her arm with weakness, sensory loss, and altered deep tendon reflexes. These findings were new and correlated with an increase in her disk protrusion demonstrated on 02/15/06. This study revealed a disk herniation at C6-7 with progression and revealed impingement on the descending cervical spinal cord.
 Prior to her surgery this patient had stable physical findings until 02/06/06 when she suffered a positional injury that evidently exacerbated her work-related injury.
 The decision to refer or not refer potentially a surgically correctable disk is a difficult one. Prior to her exacerbation of injury Ms. Tracy manifested no neurologic symptoms that would have required surgical intervention and was therefore managed conservatively. This does not ameliorate the fact that she had a work-related injury or was suffering significant pain. This also does not abolish the fact that she has significant cervical spasm, tenderness, and increased range of motion. Until her postural injury on February 6th, Ms. Tracy had no impending paralysis or loss of function of either upper extremity and was experiencing no spinal cord symptoms. She would still have all the other manifestations of a cervical disk injury including muscle spasm, tension headaches, shoulder pain, thoracic spine pain, and decreased cervical range of motion which are well documented.
 It is my opinion that Ms. Tracy suffers from a progressively herniated nucleus pulposus of C6-7 that ultimately requires surgery.
 It is also my opinion that Ms. Tracy's work absences from the date of injury until post surgery were all necessary and resulted solely from her work-related injury.
 It is my opinion that Ms. Tracy's chronic occipital cervical headaches are due to muscle spasms and traction as a consequence of her work-related injury to her cervical spine and subsequent surgical intervention.
 {¶ 20} 11. Thereafter, relator's motions were heard before a district hearing officer ("DHO") on September 11, 2006 and were granted. As such, the DHO determined that relator's claim should be additionally allowed for: "occipital muscle tension headache." *Page 11 
Based upon the June 19, 2006 narrative report and C-9 prepared by Dr. Mumma, the DHO also determined that the surgery performed by Dr. Fulton should be paid for based upon the June 10 and September 6, 2006 reports of Dr. Mumma. The DHO specifically rejected respondent Autozone, Inc.'s ("employer") argument that relator had actually sustained an intervening injury which had broken the causal connection between the original work-related injury and her subsequent condition, need for surgery, and period of disability. Further, the DHO awarded TTD compensation beginning April 25, 2006 and continuing based upon the June 9, 2006 C-84 of Dr. Mumma.
 {¶ 21} 12. The employer appealed and the matter was heard before a staff hearing officer ("SHO") on November 2, 2006. The SHO vacated the prior DHO order in its entirety and denied all relator's motions. The SHO determined that relator had sustained an intervening injury as follows:
 The Staff Hearing Officer finds that the injured worker sustained an intervening injury on 02/02/2006 when she was pushing back on the headrest of the seat in her car and re-injured her neck. The Staff Hearing Officer finds that this intervening injury was what caused the injured worker to develop severe tension headaches, to require an updated cervical MRI, and eventually surgery at C6-7 on 04/25/2006. The Staff Hearing Officer relies on the office note of Dr. Mumma (02/06/2006) in this regard, the new MRI (02/15/2006) which was immediately obtained, which shows a significant change in the disc herniation at C6-7, and the fact that the injured worker necessitated surgery after this incident, which was performed on 04/25/2006, when prior to the incident there was no recommendation for surgery, in making this finding.
 {¶ 22} 13. Relator's appeal was refused by order of the commission mailed November 24, 2006.
 {¶ 23} 14. Thereafter, relator filed the instant mandamus action in this court. *Page 12 
Conclusions of Law: {¶ 24} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. State ex rel. Pressley v. Indus. Comm.
(1967), 11 Ohio St.2d 141. A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. State ex rel. Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76. On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. State ex rel. Lewis v. Diamond FoundryCo. (1987), 29 Ohio St.3d 56. Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. State ex rel. Teece v. Indus. Comm. (1981),68 Ohio St.2d 165.
 {¶ 25} In this mandamus action, relator makes the following two arguments. First, relator contends that the commission abused its discretion by finding that she had sustained an intervening injury in the absence of any medical evidence to support that finding. Second, relator argues that the commission violated her due process rights by failing to provide her with notice that the question of an intervening injury would be addressed and that her right to participate in the workers' compensation system would be adjudicated. Because the magistrate finds that relator's first argument has merit, the magistrate recommends that this court issue a writ of mandamus, as more fully explained below. *Page 13 
 {¶ 26} It is undisputed that the commission is required to cite the medical evidence upon which it relies and provide a brief explanation for its decision. Relator contends that this court's reasoning inState ex rel. Steinbrunner v. Indus. Comm., Franklin App. No. 05AP-626,2006-Ohio-3444, should be applied in this situation as well. The magistrate agrees.
 {¶ 27} In Steinbrunner, the claimant had sustained a work-related injury affecting his lower back and was awarded a period of TTD compensation. The claimant's TTD compensation was terminated after the commission determined that his allowed conditions had reached MMI. Thereafter, the claimant tripped over his dog's leash. In a report dated November 17, 2004, the claimant's treating physician, Dr. Sauer, noted that the fall had significantly aggravated the claimant's lower back. This court adopted the conclusions of its magistrate who found that Dr. Sauer did not opine that the significant aggravation was an intervening injury which effectively eliminated the allowed back conditions as the cause of the claimant's disability. The magistrate cited State ex rel.Yellow Freight Sys., Inc. v. Indus. Comm. (1998), 81 Ohio St.3d 56, for the proposition that the commission and its hearing officers do not have medical expertise in adjudicating medical issues before them. As such, this court determined that Dr. Sauer's report failed to provide the "some evidence" needed to support the commission's decision.
 {¶ 28} The magistrate finds that the same reasoning applies in this case. The commission cited the February 6, 2006 office note of Dr. Mumma. While Dr. Mumma did state that relator reinjured her neck while pushing back her neck against the headrest of her car, nowhere in that office note did he indicate that the act of pushing her head back against the headrest constituted an intervening injury which had the effect of eliminating *Page 14 
the allowed neck conditions as the cause of disability at issue. Further, Dr. Mumma authored additional reports wherein he stated that relator's condition was exacerbated when she repositioned herself in her car. As such, the magistrate finds that the February 6, 2006 office note of Dr. Mumma does not constitute some evidence upon which the commission could rely.
 {¶ 29} The SHO also cited the more recent MRI from February 15, 2006 as evidence/proof that relator had sustained an intervening injury. The SHO noted that the MRI showed a significant change in the disc herniation at C6-7. The magistrate finds that the February 2006 MRI does not constitute some evidence upon which the commission could rely in finding that relator had sustained an intervening injury.
 {¶ 30} As noted in the findings of fact, the radiologist interpreted the MRI as demonstrating the following:
 * * * This MRI study of the cervical spine is compared to a previous such study performed on 06/28/04 revealing a broad-based disc herniation at the C6-7 level mildly flattening the cord with a protrusion of disc posteriorly to a lesser extent at the C5-6 level without mass effect at that location.
 The present study reveals the persistence of these findings with some progression disease at C6-7 level as the posteriorly protruding disc herniation does slightly impinge the descending cervical spinal cord now at the C6-7 level although no signal abnormalities of the cervical spinal cord are evident. * * *
 CONCLUSION:
 There is a persistence of cervical disc herniation at the C6-7 level and with mild C5-6 disc protrusion as well. There has been some advancement in this disease process as the posterior protruding extradural defect at the C6-7 level does abut and slightly impinge the descending cervical spinal cord in this location, which is a new finding. This is a finding of *Page 15 
clinical concern although no signal abnormalities of the cervical spinal cord are evident at this location. See above discussion. Although the disc protrusion posteriorly is broad-based, it is primarily present in the right central and paracentral location.
 {¶ 31} Contrary to the SHO's finding, the radiologist did not indicate that the February 2006 MRI showed a "significant change" in the disk herniation at C6-7. Instead, the radiologist noted that there was "some progression * * * at C6-7 level as the posteriorly protruding disc herniation does slightly impinge the descending cervical spinal cord." In the June 2004 MRI, the radiologist noted that "broad-based disc herniation at C6-7 which is mildly flattening the cord." The magistrate concludes that this mild progression noted between the 2004 and 2006 MRIs is not "some evidence" upon which the commission could rely in finding that relator had sustained an intervening injury which broke the causal connection between her allowed neck conditions and the current requested period of disability. For this reason, the magistrate finds that a writ of mandamus is appropriate.
 {¶ 32} In her second argument, relator contends that the commission denied her due process because the notices sent out before the commission hearings did not inform her that the issue of an intervening injury and, ultimately, her right to participate in the workers' compensation system, would be considered. For the reasons that follow, this magistrate disagrees.
 {¶ 33} In the present case, the employer had argued that relator had sustained an intervening injury which broke the causal connection between her allowed neck conditions and this current period of disability. This argument is a defense which can be raised by employers in opposition to any claimant's request for newly allowed conditions *Page 16 
and periods of disability compensation. By arguing that a claimant has sustained an intervening injury, the employer is simply making a causation argument by asserting that the allowed conditions or the period of disability were not caused by the original work-related injury. The issue of causation is always an issue. Claimants must always prove that the requested new allowances and/or periods of disability are caused by the original work-related injury. Employers are always permitted to argue that the newly allowed conditions and the requested disability are not caused by the original work-related injury.
 {¶ 34} Relator cites more of this court's decision inSteinbrunner. In that case, the employer had raised the issue of an intervening injury, for the very first time, at the hearing before the SHO. Prior to that time, no arguments had been made that the claimant had sustained an intervening injury which broke the causal connection between his allowed conditions and the period of requested disability. As such, this court found that the claimant did not have notice that his right to participate in the workers' compensation system was going to be adjudicated because the notice sent out did not inform him of that.
 {¶ 35} In the present case, the issue of an intervening injury was raised by the employer at the earliest opportunity. In fact, relator's treating physician, Dr. Mumma, responded with a report dated June 10, 2006, wherein he specifically opined that it was her preexisting condition which was responsible for her current period of disability and that her act of pushing her head back against the headrest in her car was nothing more than an exacerbation of that original injury and the originally allowed conditions. As such, this case is not analogous to the situation in Steinbrunner where the claimant had no opportunity to prepare a response to the employer's argument that he had sustained an *Page 17 
intervening injury. Relator herein had ample opportunity to present evidence and, in fact, did so.
 {¶ 36} Based on the foregoing, it is this magistrate's conclusion that relator has demonstrated that the commission abused its discretion by determining that she had sustained an intervening injury which broke the causal connection between her allowed conditions and her current period of disability because the evidence cited by the commission does not constitute some evidence to support its conclusion. Further, because it is that same evidence upon which the commission relied to find that the surgery was not related to the allowed conditions in the claim, the commission failed to cite medical evidence to support its conclusion. With regard to the request for newly allowed conditions, the commission could determine that relator failed to present sufficient medical evidence to support the additionally allowed conditions irrespective of the fact that the evidence cited by the commission was not sufficient to deny payment for the surgery and the period of disability. As such, the magistrate recommends that this court issue a writ of mandamus ordering the commission to vacate its order which denied relator's motions for TTD compensation and for payment of surgery and the commission should issue an order granting both. Further, the commission should reconsider whether or not the medical evidence in the record is sufficient to support the granting of the additional conditions.
 *Page 1