[Cite as *State ex rel. Smurfit-Stone Container Corp. v. Indus. Comm.*, 2013-Ohio-4779.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio ex rel. Smurfit-Stone Container Corp., | : | |
| | : | |
| Relator, | : | No. 12AP-1049 |
| v. | : | (REGULAR CALENDAR) |
| Industrial Commission of Ohio and David Wenger, | : | |
| | : | |
| Respondents. | : | |

---

D E C I S I O N

Rendered on October 29, 2013

---

*Taft Stettinius & Hollister LLP,* and *Charles M. Stephan,* for relator.

*Michael DeWine,* Attorney General, and *Patsy A. Thomas,* for respondent Industrial Commission of Ohio.

*Jeffrey Waite & Associates,* and *C. Jeffrey Waite,* for respondent David Wenger.

---

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

KLATT, P.J.

{¶ 1} Relator, Smurfit-Stone Container Corporation, commenced this original action in mandamus seeking an order compelling respondent, Industrial Commission of Ohio ("commission"), to vacate its order finding that relator had not proved that a January 2009 injury to respondent, David Wenger ("claimant"), and a subsequent surgery severed the causal connection between his industrial injury and his disability. Relator

further requests that we enter an order requiring the commission to find that the claimant's January 2009 injury and subsequent surgery were the intervening causes of his disability.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, we referred this matter to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto. The magistrate found that the commission did not abuse its discretion when it determined that relator failed to prove that claimant's act of reaching for a shirt at Walmart, which caused an injury necessitating surgery, was an intervening cause that severed the causal connection between claimant's work-related injury and his disability. Because the medical reports of Drs. Peloza and Makowski are some evidence supporting the commission's decision, the magistrate concluded that the commission did not abuse its discretion. Therefore, the magistrate has recommended that we deny relator's request for a writ of mandamus.

{¶ 3} Relator has filed objections to the magistrate's decision. In its first objection, relator contends that the magistrate erred in framing the issue presented by relator. We disagree. The magistrate correctly focused on whether the commission abused its discretion by concluding that relator failed to prove the claimant suffered an intervening and superseding injury that severed the causal connection between claimant's industrial injury and his disability. Therefore, we overrule relator's first objection.

{¶ 4} In its second objection, relator contends that the magistrate should have found that the commission abused its discretion by relying on the report of Dr. Peloza. In essence, relator wants us to re-weigh Dr. Peloza's report. That is not this court's role in a mandamus action. Although relator may disagree with Dr. Peloza's opinion, it is some evidence supporting the commission's decision. Therefore, we overrule relator's second objection.

{¶ 5} In its third objection, relator argues that the magistrate erred when she concluded that the commission did not abuse its discretion by relying on Dr. Makowski's report. Again, relator wants us to re-weigh the medical evidence. Dr. Makowski's report is not internally inconsistent. His report clearly indicates that claimant's injury at Walmart and the resulting surgery were not superseding intervening causes that severed the causal connection between claimant's allowed claim and his disability. The

commission did not abuse its discretion by relying on Dr. Makowski's report. Therefore, we overrule relator's third objection.[1]

{¶ 6} Lastly, relator contends that the commission's decision is inconsistent with case law. However, the cases relator discusses simply stand for the proposition that medical evidence is needed to support a commission's determination that there has been a superseding/intervening cause that severs the causal connection between claimant's industrial injury and claimant's disability. Although relator submitted medical evidence to support its position before the commission, the commission relied instead on medical evidence submitted by claimant. In reality, relator simply argues that the commission should have relied on its medical evidence rather than the medical evidence submitted by claimant. Again, it is not the role of this court to re-weigh the evidence. Because there is medical evidence supporting the commission's decision, the commission did not abuse its discretion in denying relator's motion. Therefore, we overrule relator's final objection.

{¶ 7} Following an independent review of this matter, we find that the magistrate has properly determined the facts and applied the appropriate law. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny relator's request for a writ of mandamus.

*Objections overruled; writ of mandamus denied.*

TYACK and CONNOR, JJ., concur.

––––––––––––––––

[1] We further note that the commission also relied upon the deposition testimony of Dr. Patel. Relator advances no arguments challenging Dr. Patel's opinion.

## APPENDIX

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio ex rel.                                      :
Smurfit-Stone Container Corp.,

                                                          :

          Relator,

                                                          :          No. 12AP-1049

v.

                                                          :          (REGULAR CALENDAR)

Industrial Commission of Ohio and
David Wenger,                                             :

          Respondents.                                    :

---

## M A G I S T R A T E ' S   D E C I S I O N

### Rendered on July 16, 2013

---

*Taft Stettinius & Hollister LLP,* and *Charles M. Stephan,* for relator.

*Michael DeWine*, Attorney General, and *Patsy A. Thomas,* for respondent Industrial Commission of Ohio.

*Jeffrey Waite & Associates,* and *C. Jeffrey Waite,* for respondent David Wenger.

---

### IN MANDAMUS

{¶ 8} Relator, Smurfit-Stone Container Corp., has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission"), to vacate its order which found that relator had not met its burden of proving that a January 2009 injury to respondent David Wenger ("claimant"), had severed the causal connection between his industrial injury and his

disability and ordering the commission to find that claimant's January 2009 injury had become the intervening cause of his disability.

Findings of Fact:

{¶ 9}   1. Claimant sustained a work-related injury on March 6, 1989, and his workers' compensation claim has been allowed for the following conditions:

> Lumbar   sprain;   herniated   disc   L5[-]S1;   thoracic sprain/strain.

{¶ 10} 2. Claimant underwent an "L5-S1 [discectomy] and foraminotomy on the right side" on March 26, 1998.

{¶ 11} 3. Claimant continued to have low back pain and continued to receive treatment.

{¶ 12} 4. Augustus L. Guerrero, M.D., conducted an independent medical examination on July 13, 2000.  Dr. Guerrero stated:

> It is my opinion that an L5 S1 [discectomy] and foraminotomy on the right side for an L5-S1 disc herniation done in 1998 was very appropriate. Unfortunately his pain has persisted and is status-post [discectomy] and right foraminotomy. There is possible scar tissue formation around the S1 nerve root. I believe his chronic back condition is further aggravated by degenerative disc disease at level L4-L5.

At that time, Dr. Guerrero noted that claimant was taking OxyContin, Neurontin, and Prosac.  With regard to future treatment, Dr. Guerrero concluded:

> The L4, L5 disc degeneration is a concern and needs to be addressed with a provocative [discogram] and if confirmatory, would again confirm presence of inner disc disruption which can be helped with the IDET procedure or one or two level lumbosacral fusion. Lastly I do not believe this gentleman can return to heavy manual labor but will need permanent work restrictions. It is my professional opinion that he probably should not lift more than 35 pounds and should be allowed to sit and stand at will and his trunk rotation, bending, and twisting should be limited to an infrequent basis. Riding moving machinery especially vehicles with poor shock absorbers should be prohibited. Lastly this gentleman should be follow-up [sic] by a specialist in treatment of the lower back such as an

orthopedic surgeon or a physiatrist for the next 5-10 years on
a yearly basis.

{¶ 13} 5. In a report dated June 12, 2006, claimant's treating physician John L. Peloza, M.D., recommended surgery:

The MRI shows decreased disc signal and decreased disc height at both L4-L5 and L5-S1. At L3-L4, he has decreased disc signal but a much less degenerative spine. The facet joints at L5-S1 are significantly degenerative and this is the location of his previous surgery. He has post-surgical changes, mainly on the right side in the foramen and lateral recess. At l4-L5, he has a midline annular tear. The facets actually look okay. At L3-L4, the facets are in good condition without herniations or stenosis. He has an MRI of his thoracic spine that shows multilevel degenerative changes in the thoracic spine, but no other findings. He has also had a lumbar discogram. At L2-L3, it is normal with no pain. At L3-L4, it is abnormal morphologically with 6/10 concordant pain. At L4-L5 and L5-S1, he has abnormal morphology and severe concordant pain of 10/10.

In the lumbar spine, I think he has degenerative disc disease as well as post laminectomy syndrome. I think that his pain is discogenic, mainly from L4-L5 and L5-S1 and also from L3-L4.

Because he has post laminektomy syndrome at L5-S1 with degenerative facets, I thin that this level should be fused. I will put motion devices in at L4-L5 and L3-L4. We discussed the different motion devices. My view is that the maverick metal on metal disc replacement would be the best motion device. I would put those in at L4-L5 and L3-L4 and, at the same time, do a fusion at L5-S1 with LT cages, InFuse and pyramid plate. We have reviewed this with the patient. They really like this plan, but the Maverick is not available yet. It will probably be approved by the first quarter of 2007. The data on the maverick is showing superiority to a modern fusion technique as well as superiority to any other motion device. He will return in six months.

{¶ 14} 6. Because Dr. Peloza opined that claimant had additional conditions which should be allowed in his claim, claimant filed a motion seeking to have his claim additionally allowed for the following conditions:

> Thoracic sprain and strain[;] post laminectomy syndrome[;] degenerative disc disease L3-4 and L4-5[.]

{¶ 15} 7. As noted previously, relator allowed claimant's claim for thoracic sprain and strain; however, the issue of whether post laminectomy syndrome and degenerative disc disease at L3-4 and L4-5, while denied by the commission, are currently pending in the Hamilton County Court of Common Pleas.

{¶ 16} 8. Claimant saw Bruce E. Dall, M.D., on January 20, 2009 complaining of the sudden onset of back pain while he was at Wal-Mart.

{¶ 17} 9. Claimant consulted with Pamela K. Kilmer, M.D., on January 29, 2009. Dr. Kilmer explained what happened to claimant as follows:

> What is new and different for Mr. Wenger is an acute onset of right leg pain that happened when he reached up over his right shoulder to look at a camouflage shirt while shopping at Wal-Mart. He had an acute onset of back pain radiating into the right leg that almost sent him to his knees. He grabbed the shopping cart for some stability. Previous to this injury on 01/02/2009, his baseline was chronic back pain. He could walk on his heels, but not his toes. Now he can no longer walk on his heels. He has a previous history of lumbar laminectomy and has some chronic numbness and tingling in the right leg, but it is now worse. He rates pain as an 8 or 9. Pain medication and changing positions seem to help. Prolonged standing or walking increases right leg pain. He is making some improvement since this happened. He was practically in bed for three days straight when the injury first occurred.

{¶ 18} 10. It appears a new MRI was taken which revealed the following:

> I have reviewed his MRI, and he has the degenerative changes as stated above; but, he has a new herniated disk [sic], L4-5 on the right, which does obstruct the L5 nerve root and would be consistent with his leg symptomatology.

{¶ 19} 11. Claimant also consulted with Chetan K. Patel, M.D. In his February 12, 2009 report, Dr. Patel discussed with claimant non-operative treatment including physical therapy and injections. Dr. Patel also discussed surgical interventions in the form of a right L4-5 discectomy, fusion, decompression of the L5-S1 level, and informed claimant there was a significant chance he would continue to have persistent pain in spite of surgical intervention.

{¶ 20} 12. On March 2, 2009, Dr. Patel performed the following surgical procedure on claimant

> Revision L4-5, L5-S1 laminectomy, discectomy, T-lift, posterior spinal fusion with instrumentation, lysis of epidural adhesions right L5-S1 level, left posterior iliac crest bone graft, local bone graft.

In his operative report, Dr. Patel discussed claimant's history and the reason for the surgery as follows:

> Mr. Wenger is a 52 year old male with a history of work related injury back in 1989. He eventually underwent a right lumbar discectomy at the L5-S1 level and noted some relief of his symptoms. He subsequently has had chronic low back pain and bilateral leg pain for which he has seen multiple surgeons and contemplated surgical intervention. While he was in the process of making a decision of having a potential fusion done for his chronic pain he developed acute worsening of his right leg pain now radiating more to the dorsum of the foot along with numbness and tingling and developed a foot drop.
>
> He attempted conservative treatment of this and was not responding and wanted to undergo surgical intervention. He has seen a local neurosurgeon over in Kalamazoo, Michigan and had discussed the treatment alternatives there. He saw me for a second opinion and subsequently wanted me to perform the procedure.
>
> I discussed his imaging studies which demonstrated significant degenerative changes at L4-5 and L5-S1 level along with a right-sided L5-S1 herniated nucleus pulposus impinging on the right L5 nerve root.
>
> In addition there appeared to be significant epidural scarring at the right L5-S1 level along with a more central and left-sided disc protrusion[.] There was significant spondylotic changes present at this level as well. There was foraminal narrowing leading to foraminal stenosis at the L5-S1 level. I explained the nonoperative and operative treatment options in great detail to him. His foot drop was not improving at all and he wanted to undergo surgical intervention. I discussed performing just a decompression along from the more acute symptoms which are likely attributed to the right L4-5 disc level based on his history. He, however, felt that he had decided to go ahead and address his chronic low back and

bilateral leg pain with decompression and fusion already and wanted to proceed ahead with this. I did explain that in spite of surgical intervention his foot drop may not improve and he may still have persistent pain. I explained to him that there is a chance of actually having worsening symptoms although I do believe this is small.

{¶ 21} 13. On January 31, 2011, relator filed a C-86 motion requesting the commission find:

[One] That on January 2, 2009 David Wenger sustained a non-work related intervening lower back injury which, in conjunction with the surgery and other treatment that the intervening injury made necessary, substantially aggravated and superseded the condition "herniated disc L5-S1";

[Two] That Smurfit-Stone Container Corporation no longer has liability under David Wenger's claim for compensation and medical expenses for the condition "herniated disc L5-S1"; and

[Three] That Smurfit-Stone Container Corporation no longer has liability under David Wenger's claim for the medications OxyContin, Gabapentin, Lansoprazole, and Hydrocodone.

Relator submitted the following documentation in support of its motion:

[One] January 2 [handwritten 7th?], 2011 IME report of Thomas Bender, M.D.
[Two] Dr. Bender's January 31, 2011 Addendum report
[Three] Excerpts from the transcript of Dr. C. Patel's January 14, 2011 trial deposition
[Four] Dr. Patel's February 12, 2009 Consultation note
[Five] Dr. Dall's January 20, 2009 Consultation note
[Six] Dr. Kilmer's January 22, 2009 Consultation note
[Seven] Midwest Orthopedic Group Intake Form

{¶ 22} 14. In his January 7, 2011 report, Dr. Bender opined that the January 2, 2009 event constituted a new and distinct low back condition/diagnosis, stating:

It is my opinion to a reasonable degree of medical probability that Mr. Wenger's lumbar spine conditions significantly worsened after the time of 1/2[/]09. It is evident the claimant developed an acute extruded disc herniation at L4-5 since the time of my prior evaluation in 2008. This extruded disc herniation was identified on the MRI scan of 1/13/09 and corresponds to the symptoms recorded in Dr. Dall's

record, Dr[.] Kilmer's record, and Dr. Patel's record. In other words, what had been previously identified in 2005 as a non-compressive disc protrusion at L4-5 substantially became a neurologically compressive herniation to the degree of extrusion causing the footdrop to the right lower extremity as a result of significant L5 and S1 nerve root compression to the right lower extremity. Certainly the disc extrusion at the L4-5 level that the claimant was found to have after the time of 1/2/09 does constitute a new and distinct low back condition/diagnosis. Certainly the development of a disc extrusion represents a new and distinct circumstance or event in proximity to the time of 1/2/09 and has no relationship to either the injury of 3/6/89 or degenerative spinal disease. It is my opinion that the surgery that the claimant engaged on 3/2/09 was made medically necessary as a result of the event or circumstances that happened on 1/2/09. It is my opinion that the event of 1/2/09 resulted in an extruded disc herniation and right leg foot drop that necessitated the surgery that was performed on 3/2/09. The amount of disc extrusion at L4-5 made necessary the need for the instrumentation from L4 to the sacrum. Therefore the volume of surgery performed on 3/2/09 was made necessary by the event of 1/2/09 and the new insult to the L4-5 level. Finally, as the records indicate, Dr. Patel did not find clinical indication to perform any type of intervention to the L3-4 level.

{¶ 23} 15. Dr. Bender provided the following additional opinion in his January 31, 2011 addendum:

[I]t is my opinion that the claimant sustained a distinct and new spinal injury on 01/02/09. This event resulted in an extruded L4-L5 disk [sic] herniation and significant right leg foot drop. The characterization of the volume disk [sic] displacement as "extrusion" and a severe neurological problem to the right lower extremity resulting in a foot drop make the new injury of 01/02/09 a very substantial intervening occurrence.

{¶ 24} 16. Claimant submitted the March 3, 2011 report of David Norbert Makowski, D.O., disagreed with Dr. Bender and stated:

att. 17 reports to me that the "event" at Walmart that occurred in January of 2009 consisted of no significant physical exertion. Mr. Wenger states that he was walking behind his shopping cart in an aisle at a Walmart, when he reached for a shirt on a hanger. He estimates that the shirt was hanging at

about shoulder height. Usually activity such as this is not a cause of any medical problem, let alone disc protrusion.

But the employer's Motion, as I read it, requests a finding that the event at Walmart be found to be "intervening," in effect, for the entire workers' compensation injury. This conclusion I strongly disagree with, as did Dr. Patel. The fact is that prior to January of 2009, Mr. Wenger had been receiving ongoing treatment and medications for ongoing chronic back symptoms that were present before and after January of 2009, and which have absolutely nothing to do with Mr. Wenger shopping at Walmart. In fact, as far back as 2006, a recommendation had been made by Dr. Peloza, a renowned surgeon in Texas, that Mr. Wenger proceed with surgery because of complications from his prior surgery of 1998, which included considerable scar tissue as well as aggravation of degenerative disc disease at L4-5. Furthermore, long before January of 2009, a request had been made requesting that degenerative disc disease at L4-5 be added to Mr. Wenger's workers' compensation claim. This request had been pending for a long time when Mr. Wenger went shopping at Walmart.

In my opinion, Dr. Patel got it just right. It appears that the event at Walmart caused protrusion that ordinarily would never have been caused by such activity. This event, however, could not possibly have caused a change of the ongoing very serious problems at the L5-S1 level, and could not possibly have aggravated the ongoing degeneration at the L4-5 level, for which surgery had previously already been recommended. The protrusion occurring at L4-5 was a fluke occurrence that did not extend beyond the protrusion.

As Dr. Patel said in his deposition, when he performed surgery in March of 2009, only the part of the surgery that pertained to the disc protrusion at L4-5 was unrelated to the work injury and prior surgery in 1998. In fact, if you read through Dr. Patel's operative report, you will see that it is an unusually extensive operative report. It appears that Dr. Patel purposely details the surgery so that portions of the surgery attributable to the work injury are separable from what is not.

Reaching for a shirt when shopping at Walmart did not cause scar tissue; it did not aggravate scar tissue, and did not change in any way the portions of the surgery described by Dr. Patel that involved extensive revision of scar tissue. The

activity described places such little demand on the back that it is almost laughable to conclude that reaching for a shirt while shopping at Walmart aggravated or is now somehow the cause of Mr. Wenger's long standing degenerative disc disease at the L4-5 or need for treatment at L5-S1. It's sort of like saying that, if someone reports a worsening of chronic pain when breathing heavy, the act of breathing must be deemed to be the cause of that pain thereafter.

Mr. Wenger was injured at work in 1989 performing very heavy work activity that is associated with the type of severe back injury that he has experienced. He had extensive surgery in 1998. The surgery resulted in significant scar tissue and a need for surgery that would have arisen whether or not Mr. Wenger went shopping at Walmart. His ongoing, chronic back problems were unaffected by his trip to Walmart. It, by fluke, caused a rupture of a disc, and that's all. This conclusion is apparent from the operative report.

Maybe it is hard for a lay person to understand that it is highly unlikely that the minimal act that apparently caused disc protrusion did not cause, alter or affect any other aspects of Mr. Wenger's ongoing back problems. By analogy, if my entire car needs painted and someone taps it with a shopping cart which, by fluke, knocks off the door handle, that does not mean that the car [sic] entire car now needs to be painted because of the shopping cart.

{¶ 25} 17. Relator has attached a portion of deposition testimony of Dr. Patel taken as part of discovery in the action currently pending in the Hamilton County Court of Common Pleas.

{¶ 26} 18. The matter was heard before a staff hearing officer ("SHO") on May 16, 2011. The SHO denied relator's motion, finding that relator did not meet its burden of proving that claimant sustained an intervening and superseding injury to his low back on January 2, 2009 and that relator failed to present sufficient medical evidence to support a finding that a new injury severed the causal connection and became the intervening cause of claimant's resulting disability. The SHO stated:

The Staff Hearing Officer finds in this case that the Injured Worker due to an incident that occurred on 1/2/2009 had an acute herniation at the L4-5 level. The issue becomes: Did the acute herniation at L4-5 sever the causal connection and become the cause of the surgery and the subsequent

treatment on and after 1/2/2009? Dr. Patel in the deposition dated 1/14/2011 testified that the parts of the surgery performed on 3/2/2009 were due to the acute herniation and parts were due to the original injury. Dr. Patel testified the epidural scarring and the chronic radiculopathy that he had treated with the surgery on 3/2/2009 stems from the 1989 work injury and not the 1/2/2009 incident.

Dr. Peloza['s] [report] dated 6/2/2006 opined that the facet joints at the L5-S1 are significant[ly] degenerated and this is the location of the previous surgery.

Additionally, Dr. Peloza opined that at the L5-S1 level he has abnormal morphology and severe concordant pain of 10/10. Dr. Peloza further opined that because he has post-laminectomy syndrome at the L5-S1 with degenerative facets this level should be fused. The Staff Hearing Officer also relies on the opinion of Dr. Makowski. Dr. Makowski opined in the report dated 3/3/2011 that the event that occurred on 1/2/2009 caused the protrusion but that the event could not possibly have caused the change in the ongoing various serious problems at the L5-S1 level for which surgery had previously been recommended.

Based upon the above findings, the Staff Hearing Officer orders that the C-86 motion filed 1/31/2011 requesting a finding of an intervening injury and the removal of liability for the named employer for compensation and medical expenses for the allowed conditions in the claim is denied.

This order is based upon the deposition of Dr. Patel dated 1/14/2011, report of Dr. Peloza dated 6/12/2006 and the report of Dr. Makowski dated 3/3/2011.

{¶ 27} 19. Relator's appeal was refused by order of the commission mailed June 10, 2011.

{¶ 28} 20. Thereafter, relator filed the instant mandamus action in this court.

Conclusions of Law:

{¶ 29} In this mandamus action, relator phrases the commission's abuse of discretion, as follows:

A. THE COMMISSION ABUSED ITS DISCRETION BY NOT WEIGHING THE EVIDENCE AND ADDRESSING THE ISSUE WHETHER WENGER'S JANUARY 2009 INJURY WAS THE PROXIMATE CAUSE OF HIS MARCH 2009

SURGERY AND SUBSEQUENT DISABILITY, BUT INSTEAD ADDRESSING THE QUESTION WHETHER THERE IS ANY EVIDENCE THAT WENGER'S ORIGINAL INJURY IS STILL THE PROXIMATE CAUSE OF HIS DISABILITY.

* * *

B. THE COMMISSION ABUSED ITS DISCRETION IN FINDING A REMAINING CAUSAL CONNECTION BETWEEN WENGER'S ORIGINAL INJURY AND HIS MARCH 2, 2009 SURGERY ON THE GROUND THAT "PARTS OF THE SURGERY WERE DUE TO THE ORIGINAL INJURY."

* * *

C. THE COMMISSION ABUSED ITS DISCRETION IN FINDING A REMAINING CAUSAL CONNECTION BETWEEN WENGER'S ORIGINAL INJURY AND HIS MARCH 2, 2009 SURGERY ON THE GROUND THAT "DR. PELOZA OPINED THAT AT THE L5-S1 LEVEL [WENGER] HAS ABNORMAL MORPHOLOGY AND SEVERE CONCORDANT PAIN OF 10/10."

(Relator's brief, 6-9.)

{¶ 30} No matter how relator tries to frame its arguments in this mandamus case, the issue is relatively simple: did the commission abuse its discretion when it decided that relator failed to meet its burden of proving that claimant's act of reaching for a shirt at Walmart and the subsequent exacerbation of his symptoms constituted an intervening injury which severed the causal connection between claimant's original work-related injury and the March 2009 surgery?

{¶ 31} For the reasons that follow, the magistrate finds that relator has not demonstrated that the commission abused its discretion by finding that claimant's act of reaching for a shirt at Walmart and the subsequent exacerbation of his symptoms was not an intervening injury which severed the causal connection between his work-related injury and the March 2009 surgery.

{¶ 32} The Supreme Court of Ohio has set forth three requirements which must be met in establishing a right to a writ of mandamus: (1) that relator has a clear legal right to

the relief prayed for; (2) that respondent is under a clear legal duty to perform the act requested; and (3) that relator has no plain and adequate remedy in the ordinary course of the law. *State ex rel. Berger v. McMonagle*, 6 Ohio St.3d 28 (1983).

{¶ 33} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141 (1967). A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order which is not supported by any evidence in the record. *State ex rel. Elliott v. Indus. Comm.*, 26 Ohio St.3d 76 (1986). On the other hand, where the record contains some evidence to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. *State ex rel. Lewis v. Diamond Foundry Co.*, 29 Ohio St.3d 56 (1987). Furthermore, questions of credibility and the weight to be given evidence are clearly within the discretion of the commission as fact finder. *State ex rel. Teece v. Indus. Comm.*, 68 Ohio St.2d 165 (1981).

{¶ 34} It is undisputed that there must be a causal connection between an injury arising out of and in the course of a claimant's employment and his subsequent harm or disability. *State ex rel. Webb v. Indus. Comm.*, 76 Ohio App.3d 701 (10th Dist.1991). A claimant must provide competent medical evidence to establish that a probable relationship exists between the original work-related injury and the claimant's disabling condition. *See State ex rel. Yellow Freight Sys., Inc. v. Indus. Comm.*, 81 Ohio St.3d 56 (1998).

{¶ 35} Here, the question before the commission was whether or not claimant sustained an intervening injury which broke the causal connection between his work-related injury and his disability. In finding that claimant's act of reaching for a shirt in Walmart and the ensuing pain which followed did not constitute an intervening injury which broke the causal connection between his work-related injury and his disability, the commission relied upon the medical reports of Drs. Peloza and Makowski.

{¶ 36} In his June 12, 2006 medical report, Dr. Peloza opined that claimant needed surgery which would include fusion. This was approximately three years before the events at Walmart. In his March 3, 2011 report, Dr. Makowski agreed that the medical

evidence indicated that surgery had been recommended in 2006 and that it was necessitated due to complications from the prior surgery in 1998 which had resulted in considerable scar tissue and aggravation of claimant's degenerative disc disease at L4-5. Dr. Makowski stated further that the act of reaching for a shirt was not an intervening injury and that it could not possibly have caused a change in claimant's ongoing serious problems. As Dr. Makowski stated, claimant's activity at Wal-Mart placed "such little demand on the back that it is almost laughable to conclude that reaching for a shirt while shopping at Walmart aggravated or is now somehow the cause of Mr. Wenger's long standing degenerative disc disease at the L4-5 or need for treatment at L5-S1. It's sort of like saying that, if someone reports a worsening of chronic pain when breathing heavy, the act of breathing must be deemed to be the cause of that pain thereafter."

{¶ 37} In *State ex rel. Steinbrunner v. Indus. Comm.*, 10th Dist. No. 05AP-626, 2006-Ohio-3444, Charles Steinbrunner had sustained a work-related injury affecting his lower back and was awarded a period of temporary total disability ("TTD") compensation. Steinbrunner's TTD compensation was terminated after the commission determined that his allowed conditions had reached maximum medical improvement ("MMI"). Thereafter, Steinbrunner tripped over his dog's leash. In a report dated November 17, 2004, Steinbrunner's treating physician James E. Sauer, D.C., noted that the fall had significantly aggravated Steinbrunner's lower back. The commission relied on this report from Dr. Sauer to deny further medical treatment on grounds that Steinbrunner had suffered an intervening injury that was non-industrial and unrelated to his claim.

{¶ 38} Steinbrunner filed a mandamus action in this court and, this court adopted the conclusions of its magistrate who found that Dr. Sauer did not opine that the significant aggravation was an intervening injury which effectively eliminated the allowed back conditions as the cause of Steinbrunner's disability. The magistrate cited *Yellow Freight* for the proposition that the commission and its hearing officers do not have medical expertise in adjudicating medical issues before them. As such, this court determined that Dr. Sauer's report failed to provide the "some evidence" needed to support the commission's decision.

{¶ 39} Specifically, this court stated in *Steinbrunner*:

> Just as there must be medical evidence to support the causal relationship between the original industrial accident and the

claimed disability, there must be medical evidence to support a finding that a new injury has severed the causal connection and become the intervening cause of the resulting disability. Here, although respondents would have us believe that Dr. Sauer's November 17, 2004 report contains medical evidence that relator suffered a new and intervening injury when he tripped over his dogs, no such evidence is present.

Dr. Sauer's report merely opines that relator "significantly aggravated his lower back" by tripping over his dogs. This statement alone is not enough to support the commission's conclusion that relator suffered a new injury, let alone one that severed the causal connection between relator's industrial injury and his disability. However, as noted by the magistrate, the lack of evidence to support one conclusion does not automatically translate into the existence of evidence to support the opposite conclusion.

*Id.* at ¶ 23-24.

{¶ 40} Similarly, in *State ex rel. Tracy v. Indus. Comm.,* 10th Dist. No. 07AP-88, 2007-Ohio-5792**,** affirmed by *State ex rel. Tracy v. Indus. Comm.,* 121 Ohio St.3d 477, 2009-Ohio-1386, Mary J. Tracy sustained a work-related injury in January of 2004, and her claim was allowed for various cervical conditions including C6-7 herniated nucleus pulposus and C5-6 disc protrusion. Tracy received periods of TTD compensation through December 2005 at which time the commission determined that her allowed conditions had reached MMI.

{¶ 41} In February 2006, Tracy's treating physician Paul D. Mumma, D.O., noted that she had reinjured her neck the previous week while pushing back with her head against the headrest of her car. At that time, Tracy experienced sudden onset of pain. After reviewing new MRI images and following surgery, Dr. Mumma attributed the necessity of surgery and an additional period of TTD compensation solely to the original 2004 work-related injury. Specifically, Dr. Mumma stated:

Ms. Tracey [sic] did exacerbate her preexisting injury while repositioning herself in her car on 02/06/2006.

At that time she felt an increase in pain in her arm and her neck hurt more than usual for a while.

> Ms. Tracy had a preexisting work-related herniated nucleus pulposus at C5-6 and C6-7 documented by MRI scanning prior to her mild exacerbation of this same injury on 02/06/2006. It was preexisting and mere active pushing on the headrest would not have caused a herniated nucleus pulposus to appear somewhere else. This pathology was clearly demonstrated and addressed surgically by Dr. Fulton on 05/26/2006.

*Id.* at ¶ 18.

{¶ 42} Tracy's employer argued, and the commission agreed, that the February 2006 report of Dr. Mumma supported a finding that Tracy had sustained an intervening injury which was the cause of the new period of disability.

{¶ 43} Tracy filed a mandamus action in this court. In adopting the decision of its magistrate, this court disagreed and stated:

> The whole of Dr. Mumma's materials following the second MRI, however, leave no doubt that Dr. Mumma found relator's "original injury of 01/30/2004 was the proximate and sole cause of the neck pain, arm pain, and MRI findings of herniated nucleus pulposus of C5-6 and C6-7. It is also my opinion that her surgery was medically necessary and performed only as a consequence of her injury." (Dr. Mumma June 10, 2006 letter.) The commission had no medical reports to the contrary. Because the commission itself lacked the medical expertise to adjudicate medical issues without the necessary medical evidence, the magistrate properly concluded the commission abused its discretion in determining relator sustained an intervening injury. *State ex rel. Steinbrunner v. Indus. Comm.,* Franklin App. No. 05AP-626, 2006-Ohio-3444; *State ex rel. Yellow Freight Sys., Inc. v. Indus. Comm.* (1998), 81 Ohio St.3d 56*.*

*Id.* at ¶ 4.

{¶ 44} This court's decision was upheld by the Supreme Court of Ohio.

{¶ 45} In the present case, the commission reviewed the medical evidence and concluded that the medical evidence did not support relator's argument that claimant's act of reaching for a shirt in Wal-Mart constituted an intervening injury which broke the causal connection between the allowed conditions caused by the work-related injury in claimant's resulting disability. The commission's determination in the present case is

consistent with the case law from both this court and the Supreme Court of Ohio. The commission did not abuse its discretion by finding that the medical evidence submitted by relator was not sufficient to support relator's argument that claimant's need for surgery was related to something other than the allowed conditions in this claim. As such, it is this magistrate's decision that relator has not demonstrated that the commission abused its discretion and that this court should deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
STEPHANIE BISCA BROOKS

NOTICE TO THE PARTIES
Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).